PER CURIAM.
• The defendant, Frank Lemley, appeals from an order of the trial court granting a motion for á new trial filed by the plaintiff, Terry Wilson, after a jury had returned a verdict in favor of Lemley.

Facts

On April 17, 2009, Christopher Wilson was working for the City of Sumiton (“the Gity”). Christopher and his supervisor, Michael Carr, had been sent to mow grass on Bryan Road. It was a clear, sunny day. Carr and Christopher were in the City’s white Chevrolet 1500 pickup truck, which had emergency flashers (“the city truck”). Carr and Christopher picked up four trusties from the City jail and went to mow grass on Bryan Road. The trusties were all wearing their City-issued orange jumpsuits. At some point, they stopped for lunch and left the area where they had been mowing. They left their mowers and their warning • signs in the area. Carr testified that Christopher left his safety vest on his mower as he had been instructed to do: Carr and Christopher dropped the trusties off at the City jail' around 11:50 a.m., went to the City shop, and then went to lunch. After lunch, Carr and Christopher met back at the City shop and then went and picked up the trusties.
Around 1:25 p.m., before Carr and his crew had gotten back to the work site on Bryan Road, Tony Henderson, the driver of the City’s knuckle-boom truck, radioed Carr and asked him and his crew to come and flag traffic for him while he was operating the knuckle-boom truck on Sullivan Road, “just over the knob.” Carr, Christopher, and the trusties went to Sullivan Road. Carr testified that he pulled up on the top of the knob, parked the city truck in front of some mailboxes, and turned on the emergency flashers on the city truck. Carr and a trusty walked below where the knuckle-boom truck was located to direct traffic.' Christopher and two other trusties were next to the city truck, and those two trusties were directing traffic at that end. While the knuckle-boom truck was backing up, part of it became stuck in someone’s yard. The knuckle-boom truck was sticking out into the road perpendicular to the road; part of it was in the lane of travel on Sullivan Road for traffic coming from Sumiton.
Carr testified that between 10 and 15 vehicles went through thé area before the accident and that he did not notice that any of those vehicles had trouble stopping until traffic could be directed around the knuckle-boom truck. Carr also testified that, when the City crew is- mowing, it has signs that say “Mowers Ahead” but that there were no signs at the location where the knuckle-boom truck got stuck. ' Additionally, he testified that there were no flashing signs, orange cones, or anything else to warn about the ’presence of the *837 knuckle-boom truck that was in the roadway. During defense counsel’s re-cross-examination of Carr, the following occurred:
“[Defense counsel:] The City of Su-miton doesn’t have a policy about people working on the side of the road having safety devices set up?
“[Carr:] Yes.
“[Defense counsel:] And they weren’t set up, were they?
“[Carr:] Not — as our crew goes, our stuff gets set up.
“[Defense counsel:] But in this situation, they weren’t set up; right?
“[Carr:] All of our stuff was on Bryan Road.
“[Defense counsel:] Right. At the accident scene, the Safety devices were not set up; correct?”
Carr further testified that, when he received the call from Henderson, it was a situation that had to be attended to immediately and that he and Christopher did not have time to return to Bryan Road to get Christopher’s safety vest. Carr admitted that he remembered making the statement “that there were enough vests for everybody on the crew there.” However, Carr also testified that Christopher did not do anything that was against his instructions, did not do anything that Carr considered unsafe, and did not do anything that Carr would consider as violating the City’s policies.
At some point, the two , trusties whp were near. Christopher went to the city truck to get cigarettes and were no longer monitoring the traffic. Christopher was standing on the side of the road next to the city truck, and he was “kind of’ flagging traffic until the trusties got their cigarettes.
Lemley had gotten off work that ¡afternoon after working 16.5 hours at the Miller Steam Plant. Lemley had a commercial driver’s license and hauled flash at the steam plant. After leaving work, Lemley was driving home in his personal vehicle, a white Chevrolet Silverado, on Sullivan Road.
Lemley testified that, as he topped the rise on Sullivan Road, he saw the knuckle-boom truck in the roadway. He further testified:
“About the time I seen the knuckle truck, [Christopher] come out and stepped out in the road and throwed [sic] his hand up.”
He testified that Christopher kept going and threw up both hands. He further testified that he thought Christopher said “Stop,” He also testified that he put on his brakes as soon as he saw Christopher and that he “locked [his] truck down and slid 23 feet.” Lemley was not able to stop in time, and his vehicle - struck Christopher, who died of his injuries. Lemley testified that Christopher came into contact with his vehicle close to the center of his hood.
Barbara Holloway, who lived on Sullivan Road, testified that, on the afternoon of the accident, she was sitting on the front porch of her house, which was across the street from the area where the city truck was parked. She also testified that she saw Lemley’s vehicle hit Christopher; that the point of impact was in the street at her driveway; and that Lemley was in the lane of travel coming from Sumiton. Holloway further testified that she saw a white vehicle coming up the hill; that it did not look like the vehicle was slowing down; that Christopher was wáving his hands and trying to get the vehicle to stop; and that she saw Christopher fly over the hood of the vehicle. When asked if it looked like Lem-ley had slowed down or if she saw Lemley slow down before he hit Christopher, she replied:
*838 “It looked like he was going to go around [Christopher] and then another truck — I saw the hood of the other truck as it got,up there at the top of the hill.”
She further testified that it did not look like Lemley tried to brake and that she did not hear squealing tires or any other noise that made her think that Lemley had tried to stop his vehicle before striking Christopher.
Regina Higgins testified that she was a passenger in k blue Chevrolet Avalanche truck traveling in the opposite direction of Lemley’s vehicle and that her sister-in-law, Janice Gilkey, was driving. She testified that the knuckle-boom truck was stuck at the bottom of the hill and that a flagger 'had told them to go on; that they- were proceeding up the hill; that they saw Christopher and stopped;' that Christopher was on the side of the road by the. mailboxes; that Christopher turned and saw a vehicle coming; and that Christopher went to the center of the road and motioned with his hands to get the vehicle to stop. Higgins testified that, apparently, the vehicle kept coming because Christopher darted in front of the Avalanche to keep from getting hit and that the driver’s side of Lemley’s vehicle clipped Christopher on the side. She testified that, at the tíme he was struck, Christopher “was in the center — about the center line trying to get completely out of that lane.” Higgins further testified that she did not hear the squealing of brakes or hear brakes being applied; that she did not see Lemley’s vehicle move in any. way to .make it look like it -was , locked down; and that she did not see any indication of Lemley’s slowing down before he struck Christopher.,
. Carr testified that he did not. see Christopher get hit; that he heard one of the trusties yell, “‘Watch out, Chris’”; that, by the time he turned around, Christopher had already been hit; and that he did not hear the squealing of brakes, - did not hear the sound of skid, marks being laid down, and did not hear anything to indicate that someone was trying to stop quickly. Carr testified that he then telephoned the dispatcher and reported that there had been an accident, and the dispatcher sent paramedics. He also telephoned his supervisor, George Woods.
Evidence was presented indicating that, after Christopher was hit, he was thrown into the. air, landed on the road in front of the Avalanche, and rolled underneath the Avalanche,
The evidence established that the speed limit on Sullivan Road at the time of the accident was 25 miles per hour. Trooper David Larimer, a traffic-homicide investigator with the Alabama Department of Public Safety, and his supervisor, Cpl. Shane Porter, investigated the accident resulting in Christopher’s death. Trooper Larimer testified that he talked to Lemley after the . accident and that Lemley stated that, as Lemley topped the hill, Christopher stepped into the road and he applied his brakes and started sliding. Trooper Larimer testified that, based on the skid marks and the coefficient of friction, he calculated that Lemley’s vehicle was traveling at 40 miles per hour when he applied his brakes, but that he did not calculate Lemley’s speed at the top of the rise or until he reached the area where the skid marks started and that he did not know whether Lemley had applied his brakes without leaving a skid mark before that. In his report, Trooper Larimer stated: “[T]his crash occurred due to Frank Richard Lemley speeding and not being able to stop iñ time.” Trooper Larimer' also testified that th¿ top 'of the rise Leiriley crested was 460 feet from the area of impact. During further redirect examination of Trooper Larimer by Terry’s counsel, the following occurred: -
*839 “[Terry’s counsel:] Is that ample time to have stopped if you are doing 40 miles an hour?
[[Image here]]
“[Trooper Larimer:] In my opinion in 400 feet, you should be able to stop at 40 miles an hour,
“[Terry’s counsel:] So, he sees Chris and he has got time to stop, would that be why you didn’t contribute any part of the vest to the' cause of this fatality?
“[Trooper Larimer:] Good question. My answer to that would be the cause of the wreck was the speed and not being able to stop in time. :
“[Terry’s counsel:] That was your only conclusion, nothing to do with the vest or not a vest; correct? '
“[Trooper Larimer:] Gan I expound on my answer? I don’t want to say yes or no and not be able to talk.
“[Terry’s counsel:] Okay.
“[Trooper Larimer:] • All right. In my report, Lhave that he wasn’t.wearing a vest and the reason he wasn’t wearing a vest. Under conclusions and recommendations, I am showing what the cause of the crash was. Contributing, if somebody was just out in the road and wasn’t with a road crew, the vest wouldn’t have come into play.
“In any opinion, there needs to be all of that involved. But by just putting down this, it is kind of clearcut in any mind in conclusion and recommendations, if I [am] making any sense of this at all. That is all that I can put down from the evidence that we have. I can’t really give my opinion on that.
“[Terry’s counsel:] From the evidence that you had and what you know and we have mentioned the vest, and we have mentioned the lack of cones;' this, that and the other. Your official conclusion is what you have already stated, that Mr. Lemley’s speed was the cause of the fatality? ,
“[Trooper Larimer:] That is right.”
Finally, Trooper Larimer testified that, a few months after the accident, he returned to the area to determine how fast people typically travel on Sullivan Road. In making that determination, he took the average speed of 10 vehicles that day, and the average speed on the part of Sullivan Road where the accident happened, was 89.8 miles per hour.
• Holloway and Higgins both testified that they thought Lemley was traveling between 40 and 45 miles per hour. Lemley testified that he thought he was traveling between 30 and 35 miles per hour. However, in his deposition, he testified that he was traveling at' 35 miles per hour. At trial, Lemley testified that he did not know that Trooper Larimer had found that he was traveling at 40’ miles per hour. When asked about testimony that he was going 45 miles per hour, Lemley responded:
“I wasn’t doing1 no- 45. • I don’t think I • was. It might have been doing 40, but I, you know,‘didn’t look at thé speedometer.”
Lemley testified that he did not see any flashing lights on the knuckle-boom truck and that he was positive that the flashing lights were not on. He also testified that he did not remember seeing any flashers on the city truck and that he did not see any flashing lights as he came over the hill. Higgins testified that the knuckle-boom truck had an orange light on the top and flashers on the rear. Carr likewise testified that there was a clear flashing light on the back of the knuckle-boom truck and an orange light on the top of the roof of the knuckle-boom truck and that those lights were on when it was stuck. However, the defense presented evidence that, in a statement taken approximately four months after, the accident, Carr stated *840 that he did not know if the lights on the knuckle-boom truck were on.
At trial, Carr testified that, after the accident, he, initially went to Christopher and stayed with him until the paramedics arrived. He testified that, after the paramedics arrived, he went to where the trusties were and then went to talk to Lemley. Carr testified that he talked to Lemley about 10 to 15 minutes-after the accident and that Lemley said that he was sorry, that he did not see Christopher, and that he was blind in one eye. He further testified that -Lemley was wearing glasses at that time. However, Lemley denied telling Carr that he was blind in one eye and said that that statement was n,ot true. Additionally, the defense presented evidence indicating that, in the statement he made four months after the accident, Carr said that he had not talked to the driver of the white Chevrolet truck and that he had stayed with Christopher.
Higgins testified that she could not see Lemley’s face immediately before or at the time he hit Christopher.. However, she testified that, after Christopher was struck, Lemley’s vehicle rolled forward and came to a stop next to the Avalanche in which she was a passenger; that, when she got out of her vehicle, she saw Lemley; that Lemley. appeared to be looking for something in his vehicle; that Lemley was not wearing glasses at that time; and that, by the time law-enforcement officers approached Lemley, he was wearing glasses. Higgins admitted that she did not tell law-enforcement officers that Lemley was not wearing glasses when she first saw him, but she stated that no one had asked' her. Higgins testified that the first statement she made about Lemley’s not wearing glasses was in an affidavit she executed two and one-half years after the accident.
Lemley testified that his driver’s license had a corrective-lenses restriction; that he was wearing his glasses at the time of the accident; and that, as soon as he stopped after the accident, he took off his glasses to wipe tears from his eyes. Additionally, Dr. Sam Hollingsworth, an ophthalmologist, testified that he had seen Lemley one time in July 31, 2008; that Lemley’s medical-history questionnaire indicated that Lemley was having problems with his vision, that could not see well, and that his vision limited his daily activities; that he thought Lemley could meet the legal requirements to drive without his glasses, but he would see better with them; that he thought that Lemley would be able to drive, especially during the day; that Lemley’s glasses did not have a very big correction; that Lemley’s distance vision-was prétty good; and that Lemley would not be able to read well without glasses. Filially, he testified that he did not think it was unsafe for Lemley to drive.

Procedural History

On July 10, 2009, Terry, as Christopher’s father and as the personal representative of Christopher’s estate, filed a wrongful-death action against Lemley.[1] In his complaint, he alleged that Lemley “was guilty 'of negligence and/or wantonness by speeding,'by failing to keep a lookout and by needlessly striking Christopher Alton Wilson who was in plain view.” He further alleged that Christopher was killed as a proximate consequence of Lemley’s “negligence and/or wantonness combining *841 or concurring with the negligence and/or wantonness of any other defendant(s) or alone.”
Lemley filed an answer in which he denied each and every material allegation in the complaint. He also alleged that Christopher was “guilty of negligence which proximately caused and/or contributed to his damages.”
Following a trial, the jury returned a verdict in favor of Lemley. On June 13, 2013, the trial court entered a judgment based on the jury’s verdict. On July 3, 2013, Terry filed a motion for a new trial in which he argued that the verdict “is not sustained and/or supported by the great preponderance of the evidence.” Lemley filed a response in opposition to Terry’s motion for a new trial. The trial court set a hearing on the motion for September 25, 2013.[2] On September 27, 2013, the trial court granted Terry’s motion for a new trial. This appeal followed.

Standard of Review

“The standard of review to be applied by this Court in reviewing the granting of a motion for a new trial is set out in Jawad v. Granade, 497 So.2d 471, at 477 (Ala.1986):
“‘[A]n order granting a motion for new trial on the sole ground that the verdict is against the great weight or preponderance of the evidence will be reversed for abuse of discretion where on review it is easily perceivable from the record that the jury verdict is supported by the evidence.’
“Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160 (Ala.1988), sets out the procedure for the application of the Jawad standard:
“ ‘[W]hen the evidence meets the “sufficiency” test, jury verdicts .are presumed correct, and this presumption is strengthened by- the trial court’s denial of a motion for new trial. Therefore, a judgment based upon a jury verdict and sustained by the denial of a post-judgment motion for a new trial, will not be reversed on a weight-of-the-evidence ground unless it is “plainly and palpably’ wrong. Ashbee v. Brock, 510 So.2d 214 (Ala.1987). See, also, Jawad v. Granade, 497 So.2d 471-(Ala.1986).’
“539 So.2d at 162-63.
“While the ‘new trial’ test is a subjective one .... and is measured by a discretionary standard, the range of the trial court’s discretion, as announced in Jawad, has been considerably narrowed. Thus, the trial court is left with[1] no discretion to grant a new trial on a ‘weight of the evidence’ ground', except when the verdict and the judgment entered thereon are s'o 'against the great' weight and preponderance of the evidence as to be ‘plainly and palpably’ wrong, i.e., ‘manifestly unjust.’ ”
Richardson v. Joines, 574 So.2d 787, 787-88 (Ala.1991).

Discussion

Lemley argues that the trial court erred in granting Terrys motion for a new trial. In his complaint, Terry asserted claims of negligence and wantonness against Lemley.
“To establish negligence,, 'the plaintiff must prove: (1) a duty tp a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. Albert v. Hsu, 602 So.2d 895, 897 (Ala.1992). To .establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omit *842 ted some known duty. To be actionable, that act or .omission must proximately cause the injury of which the plaintiff complains. Smith v. Davis, 599 So.2d 586 (Ala.1992).
“Proximate cause is an essential element of both negligence claims and wantonness claims. See Albert, supra; Smith, supra. Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred. Thetford v. City of Clanton, 605 So.2d 835, 840 (Ala.1992). An injury may proximately result from concurring causes; however, it is still necessary that the plaintiff prove. that the defendant’s negligence caused the injury. Buchanan v. Merger Enterprises, Inc., 463 So.2d 121 (Ala.1984); Lawson v. General Telephone Co. of Alabama, 289 Ala. 283, 290, 267 So.2d 132, 138 (1972).”
Martin v. Arnold, 643 So.2d 564, 567 (Ala.1994).

A.

Initially, Lemley, argues that the evidence at trial was sufficient for the jury to determine that he was not negligent. Specifically, Lemley notes that, in his motion for a new trial, Terry argued that Lemley’s violation of the speed limit constituted negligence per se but that Terry did riot cite any authority for that position and Alabama law does not support that position. As Lemley points out, in Odom v. Schofield, 480 So.2d 1217, 1218 (Ala.1985), this Court stated:
“As Chief Justice Torbert pointed out in Fox v. Bartholf, 374 So.2d 294 (Ala.1979), however, merely exceeding the statutory -speed .limit does not, in itself, establish actionable negligence. Several other requirements are involved — most particularly the requirement. that the jury must find that the statutory violation proximately caused the injury.”
Lemley argues that he presented evidence indicating that his speed was not the cause of Christopher’s death and that “required safety devices were not placed at the scene in violation of a City of Sumiton employee policy.”[3] He further argues that the evidence indicated that Christopher was .not wearing a safety vest when he was struck, had not been provided with a cautionary sign with which to signal oncoming traffic, and “voluntarily stepped into the roadway and directly in the path of an oncoming vehicle.” Thus, Lemley contends that, because evidence was presented of alternative causes of Christopher’s death, it would not have been unreasonable for the jury to find that he was riot negligent.
In this case, Trooper Larimer testified that, in his report, he found that “this crash occurred due to Frank, Richard Lemley speeding and not being able to stop in time.” However, the evidence was undisputed that there were no warning signs to alert Motorists like Lemley that work crews were in the roadway; that Christopher was not wearing a safety vest; *843 that Christopher did not have any safety flags, signs, or devices; and that Christopher was wearing neutral-colored clothing when he was hit. At trial, Carr testified that Christopher had left his safety vest on his mower before lunch as he. had been instructed to do. However, Lemley presented evidence indicating that Carr had previously given a statement in which .he had said that there were enough safety vests there for everyone on the crew.
Further, there was • conflicting evidence regarding when Lemley initially applied the brakes in his vehicle. Holloway testified that it did not look like Lemley tried to brake and that she did not hear squealing tires or any other noise that made her think that Lemley had tried to stop. Higgins and Carr both testified that they did not hear squealing brakes and did hear anything to indicate that the driver was trying to stop quickly. However, Lemley testified that he put on his brakes as soon as he saw Christopher and that he “locked [his] truck down and slid 23 feet.” Further, Trooper Larimer testified that there were skid marks on the road. The jury could have resolved these conflicts in favor of Lemley and found that Lemley had applied his brakes as soon as he saw Christopher.
Additionally, there was conflicting evidence as to whether the knuckle-boom truck or the city truck had on lights and/or flashers. Lemley testified that he did not see any flashing lights on the knuckle-boom truck and that he was positive that the flashing lights were not on. He also testified that he did-not remember seeing any flashers on the city truck and that he did not see any flashing lights when he crested the hill. Higgins testified that the knuckle-boom truck had an orange light on the top and flashers on the rear. Garr likewise testified that there-was a clear flashing light on the back of the knuckle-boom truck and an orange light on the top of the roof of the knuckle-boom truck and that those lights were on. However, Lem-ley presented evidence indicating that, approximately four months after the accident, Carr gave a statement in which he said that he did not know if the lights on the knuckle-boom truck were flashing. The jury could have resolved those conflicts in favor of Lemley and determined that there were no flashing lights on either the knuckle-boom truck or the city truck.
Terry also presented evidence indicating that Lemley’s. driver’s license included a corrective-lenses restriction and that Lem-ley was not wearing his glasses at the time of the accident. However, Lemley testified that he was, in fact, wearing his glasses at the time of .the accident. Carr also testified that he talked to Lemley after the accident and . that Lemley , had told him that -he was blind in one eye and that he did not see Christopher. However, .Lem-ley denied making any such statement and said that that statement was not true. Also, Lemley presented evidence indicating that, about four-months after the accident, Carr gave a. statement in which he said that he did not talk to the driver of the white Chevrolet vehicle.. Additionally, Lemley presented evidence indicating that his distance vision was not bad and that he could probably pass the vision requirements for an Alabama driver’s license without corrective lenses. Thus, the jury was presented with conflicting evidence as to whether, Lemley was wearing glasses at the tipie of the accident ,and as to whether Lemley’s vision was a proximate cause of the accident, and the jury could have resolved those conflicts in favor of Lemley.
Terry presented evidence indicating that the speed limit on Sullivan Road was 25 miles per hour and that Lemley was traveling 40 miles per hour at the time of the accident. However, Lemley presented evi *844 dence indicating that, a few months after the accident, Trooper 'Larimer went to the area where the accident occurred to determine how fast people typically traveled on Sullivan Road and that the average speed of 10 vehicles that day was 39.8 miles per hour.
Based on the conflicting evidence, the jury could have concluded that Lemley’s speed at the' time of the accident was not the proximate cause of Christopher’s injuries and that Lemley was not negligent.

B.

Next, Lemley argues that there . was evidence at trial'that would have supported a jury determination that Christopher was contributorily negligent.
“ ‘In order to prove contributory negligence, the defendant must show that the party charged: (1) had knowledge of the condition; (2) had an appreciation of the danger under the surrounding circumstances; and (3) failed to exercise reasonable care, by placing himself in the way of danger.’ Brown v. Piggly-Wiggly Stores, 454 So.2d 1370, 1372 (Ala.1984) (citing Hatton v. Chem-Haulers, Inc., 393 So.2d 950 (Ala.1980); and Baptist Med. Ctr. v. Byars, 289 Ala. 713, 271 So.2d 847 (1972)).”
Lyons v. Walker Reg’l Med. Ctr., 791 So.2d 937, 944 (Ala.2000).
Even if the jury had concluded that Lemley was negligent, there was evidence that would have supported a finding by the jury that Christopher was contributorily negligent. As we noted in Part A of this opinion, the evidence was undisputed that there were no warning signs in the area; that Christopher was not wearing a safety vest at the time of the accident; that Christopher did not have any warning flags, signs,' or devices near him in the roadway; and that Christopher was wearing neutral-colored clothing when he was struck. Additionally, Lemley presented evidence indicating that Carr had previously made the statement “that there were enough vests for everybody on the crew there.” Also, there was conflicting evidence from which the jury could have concluded that- the flashing lights or warning lights on the knuckle-boom truck and the city truck were not actually on. However, Christopher stepped out in front of a speeding vehicle, despite the lack of a safety vest, safety equipment, and warning devices. Based on this evidence, the jury could have reasonably concluded that Christopher had knowledge of the dangerous condition; that Christopher appreciated the danger under the circumstances; and that Christopher failed to exercise reasonable care by stepping out in front of a speeding vehicle under such circumstances. Thus, there was evidence that would have supported a finding by-the jury that Christopher was contributorily negligent.

c.

 Lemley also argues that there Was evidence at trial that would have supported a jury determination that he did not act wantonly. With regard to the wantonness claim, Terry focused on evidence regarding Lemley’s health problems; evidence regarding the number of hours Lemley had worked' that week; evidence indicating that Lemley was not wearing his glasses at the time of the accident; and evidence indicating that Lemley was traveling 40' miles per hour in a 25 miles per hour zone.
At trial, Terry presented evidence indicating that Lemley was being treated for various health conditions, including uncontrolled diabetes, diabetic renal disease, coronary disease, high cholesterol, hypertension, some ■ arthritis, and obesity. He also presented evidence regarding medications Lemley was taking. Terry further *845 presented evidence indicating that, at the time of the accident, Lemley had gotten off work after working for 16.5 hours and that Lemley had worked a total of 63.5 hours that week preceding the accident. However, Terry did not present any evidence to establish that Lemley’s health problems, the medications Lemley was taking, or the hours Lemley had worked that day or that week proximately caused the accident.
Further, as we noted in Part A of this opinion, there was conflicting evidence from which the jury could have concluded that Lemley was wearing his glasses, at time of the accident. Additionally, although there was evidence indicating that Lemley was traveling 40 miles per hour at the time of the accident, Trooper Larimer testified that, when he went to the area where the accident occurred a few-, months after the accident, he determined that the average speed on that part of the road was 39.8 miles per hour. Thus, there was evidence from which the jury could have concluded that Lemley did not act wantonly.

Conclusion

In this case, the jury was presented with conflicting evidence. When the evidence is viewed in a light most favorable to Lemley and all reasonable inferences the jury was free to draw are indulged, it is easily perceivable from the record that the jury verdict in favor of Lemley as to the negligence and wantonness claims was supported by the evidence. See Syx v. Britton, 894 So.2d 715, 720-21 (Ala.Civ.App.2004) (“We cannot say that it is ‘easily perceivable’ from the record that the jury verdict in favor of Syx and S.P. Richards Company was unsupported by the evidence. ... There was conflicting evidence as to whether Syx’s negligence was the proximate cause of the injuries for which Britton sought recovery at trial.”); Richardson v. Joines, 574 So.2d at 788 (“While the plaintiffs presented contrary evidence sufficient to support a verdict in their favor, we cannot agree with their argument that the court properly granted their motion for a new trial. The jury, after hearing the evidence presented by the parties and seeing the witnesses, apparently believed the defendants’ evidence and concluded that the defendants were not liable for the damages claimed.”). Therefore, the trial court exceeded its discretion when it granted Terry’s motion for a new trial.
For the above-stated reasons, we reverse the trial court’s order and remand this case for the trial court to reinstate the jury’s verdict and to enter a judgment on the verdict.
REVERSED AND REMANDED.
STUART, BOLIN, PARKER, SHAW, and MAIN, JJ., concur.
MOORE, C.J., and WISE and BRYAN, JJ., dissent.

. Terry also included a claim against Alfa Insurance Company and One Beacon Insurance Company seeking uninsured/underin-sured-motorist benefits. Terry dismissed Alfa as a defendant pursuant to a pro tanto settlement agreement. One Beacon ultimately opted out of participating in the trial proceedings. In his complaint, Terry also included several fictitiously named defendants. However, he did not subsequently amend his complaint to substitute any named defendants for those fictitiously named defendants.

. The record on appeal does not include a transcript of any such hearing

. At trial, the following occurred:
"[Defense counsel’:] The City of Sumiten doesn't have a policy about people working on the side of the road having safety devices set up?
“[Carr:] Yes.”
Defense counsel then went on to elicit testimony that the safety devices in possession of Carr’s crew were set up on Bryan Road and were not set up at the scene of the accident, However, ■ the defense did not present evidence regarding what the City’s policy regarding safety devices actually was or whether the fact that Carr’s crew had not sot up safety devices at the site where the knuckle-boom truck was stuck actually violated any City policy.