BOLIN, Justice.
Elmer G. Fleming, an incapacitated person, by and through his wife and guardian, Wanda A. Fleming (“Fleming”), and Jam-arion Williams, a minor dependent of Rodney Williams, by and through his mother and next friend, Laquenta Dixon; Shami-rey Williams, a minor dependent of Rodney Williams, by and through her mother and next friend, Latisha Sandrill Bolden; and Jacory Williams and Demond Williams, minor dependents of' Rodney Williams, by and through their-mother and next friend Kathryn Davis (hereinafter referred to collectively as “the Williams plaintiffs” and sometimes referred to collectively with Fleming as “the plaintiffs”), appeal from a summary judgment in favor of Sanders Lead Company, Inc., Roy Bag-gett, and Donnie Glover (referred to collectively as “the defendants”), on the plaintiffs’ claims alleging that the defendants “affirmatively undertook [a duty] to inspect for, identify and provide remedies to correct jobsite safety hazards” on the premises of the employer of Elmer Fleming and Rodney Williams, KW Plastics Recycling Division, LLP (“KWPRD”), and that the defendants negligently and, wantonly performed the undertaken duty to inspect.

*1162
Facts and Procedural History

In November 2010, Rodney Williams and Elmer Fleming were employed at EWPRD. Williams was employed, as a supervisor in the shipping department, and Elmer was training to become a shipping supervisor. KWPRD is in the business of selling recycled plastic. KWPRD purchases scrap plastic in the form of baled plastic bottles. After the scrap plastic has been washed,' it is converted into recycled-resin pellets and sold to the packaging industry. KWPRD ships the recycled-resin pellets in tanker-trailers hauled by semi-tractors. The tanker-trailers are delivered to the KWPRD shipping yard by Wiley Sanders Truck Lines (“WSTL”). Once the tanker-trailers are delivered, a KWPRD employee attaches, a tanker-trailer to an Ottawa brand semi-tractor[1]— which is used for moving tanker-trailers within a shipping yard—and then backs the tanker-trailer into a loading bay. The reeycled-resin pellets -are then blown by pressurized air into the tanker-trailers through hoses connected to the trailers. A KWPRD employee returns the loaded tanker-trailer to the .shipping, yard using the Ottawa semi-tractor. The loaded tanker-trailer is then picked up by WSTL and hauled to its destination.
Edward Ousley was employed' by KWPRD in its shipping department where he had operated the Ottawa semi-tractors for a number ■ of years. Ousley testified that he received on-the-job training on how to operate the semi-tractors from the other drivers of the Ottawa semi-tractors and from the WSTL drivers. Ousley stated that the Ottawa drivers and the WSTL drivers instructed him on the operation of the Ottawa semi-tractor until he was able to demonstrate “enough control where [he] could handle the Ottawa and back the tankers in and out of the hold.” Once Ousley demonstrated an ability to operate an Ottawa semi-tractor, he was allowed to operate one by himself. Ousley further testified that he was never trained to use a spotter when using the Ottawa semi-tractor to back a tanker-trailer into a loading bay. Additionally, Ousley testified that he was never provided any safety policies or procedures regarding the operation of the Ottawa semi-tractor, including using the Ottawa semi-tractor to back a tanker-trailer into a loading bay. Ousley stated that he had used an Ottawa semi-tractor to back a tanker-trailer into the loading bay at KWPRD “thousands” of times without incident.
On November 8, 2010, Ousley began his shift at KWPRD at 6:00 a.m. The weather was sunny and dry. Williams and Elmer entered the area of the loading bay at approximately 10:00 a.m. Williams, who was training Elmer, was familiarizing Elmer with the loading bay and how the recycled-resin pellets were loaded into the tanker-trailers. Ousley testified that Williams instructed him to retrieve a tanker-trailer and to back it into the loading bay. Ousley stated that he took an Ottawa semi-tractor to the shipping yard and hooked it to a tanker-trailer and returned to the loading bay. Ousley testified that before he began to back the tanker-trailer into the loading bay, he checked the outside rearview mirrors of the semi-tractor to ensure that the path behind him was clear. Ousley stated that he saw both Williams and Elmer in the outside rear-view mirrors of the semi-tractor and that they were standing next to each other *1163 approximately 40 feet behind the tanker-trailer. Ousley testified that they were facing the rear of the tanker-trailer and that Williams was motioning for him to “come on back.” Ousley stated that everyone employed in the shipping area of KWPRD was familiar with the arm motion being used by Williams because it was used on a daily basis each time someone would back a tanker-trailer into the loading bay. Ousley testified that as he slowly began to back the tanker-trailer into the loading bay he repeatedly scanned both of the outside rearview mirrors. Ousley stated that for approximately one minute he continued to observe Williams in the mirrors motioning for him to “come on back.” However, Ousley testified that he lost visual contact with Williams and Elmer wheh he closed the distance between the tanker-trailer and the men to about two tanker-trailer lengths. Ousley stated that he assumed that the men had left the loading bay by walking left toward the product-storage silos or to the rear of the loading bay where a door leads to the inside of the KWPRD plant. Ousley testified that each time he acted as a spotter for another driver or someone else acted as a spotter for him, the person acting as a spotter would exit the loading bay in this manner. Ousley stated that he then felt a bump and heard a scream. Ousley testified that after he heard the scream, he put the Ottawa semi-tractor in park, “jumped out,” and ran to the réar of the tanker-trailer to see what had happened. Williams was dead and Elmer suffered a permanent traumatic brain injury when the two men were run over by the tanker-trailer.
Sanders Lead Company, Inc. (“Sanders Lead”), is in the business of recycling lead-acid automobile batteries and is located across the road from the KWPRD plant.[2] The Sanders Lead Environmental, Health, and Safety Department (“the EHS department”) was responsible for overseeing KWPRD’s compliance with regulations of the Occupational Safety and Health Administration (“OSHA”) and for providing safety training for KWPRD because KWPRD had no safety department of its Own. Roy Baggett was employed by Sanders Lead and by KW Plastics, Inc. (“KWP”), as the manager of environmental affairs,[3] and, as the manager of environmental affairs, he was the head of the EHS department. The EHS department was located in the “training building” on the premises of. Sanders Lead. The EHS department provided orientation and health and safety training to newly hired KWPRD employees on a variety of safety topics, including hazardous materials, forklift operation, bloodborne pathogens, lockout/tag-out procedures, and fall protection. Baggett testified that once a new employee had completed this safety training, the employee was assigned to a particular position at KWPRD where the employee would go through specific on-the-job training for that particular position. Baggett also testified that the EHS department “handled” the OSHA-required safety logs for KWPRD.
The KWPRD supervisors were responsible for conducting weekly or biweekly safety meetings with the employees under their supervision. The purpose of these meetings was to address common safety issues arising in the different departments or any incidents that might have occurred in a particular department. Williams, as the supervisor of the shipping department, conducted the'safety meetings for that dé-partment. The KWPRD supervisors would interact with the EHS department *1164 at the supervisory level when necessary; however, the KWPRD supervisors were considered the “lead” persons for safety for their -department because they were present on a daily basis and were the “eyes and ears” of their respective departments. The EHS department developed an employee handbook specifically for KWPRD employees. The employee handbook provided, in part:
“Safety Office:[4] While the safety coordinator and safety director will have other duties, their major concern will be analyzing accident reports, establishing workable safety rules, conducting weekly safety inspections and coordinating activities with sate and federal agencies.”
(Emphasis added.)
Donnie Glover was employed by Sanders Lead as its director of health and safety. Glover was a member of the EHS department, and Baggett was his supervisor. Baggett testified that Glover was responsible for performing quarterly safety audits of the KWPRD facility and then sharing with KWPRD his findings or recommendations gleaned from those audits. The KWPRD supervisors would then take the information obtained from Glover and establish “workable safety rules.” Baggett also testified that the EHS department and Glover would develop particular “standard operating procedures” for implementation at KWPRD, including procedures for poweredfindustrial-truck safety. Bag-gett stated that Glover would develop these “workable safety rules” and “standard operating procedures” and that he would review them from an administrative aspect. Baggett testified that he had witnessed on occasion Ottawa semi-tractor drivers using spotters when backing a tanker-trailer into a loading bay but that he did not know whether, at the time of the incident made the basis of this case, a written policy or procedure existed at KWPRD for the task.
Glover testified that he was not employed by KWPRD and that he did not take direction or instruction from KWPRD. Glover stated that KWPRD did not have its own safety department and that he served as a “consultant” to KWPRD on safety issues. Glover testified that, as a consultant to KWPRD, he would assist with documentation and record-keeping for regulatory purposes, perform hazard assessments, and develop safety policies and procedures for KWPRD. Glover stated that the department supervisors at KWPRD formulated the actual safety rules because the department supervisors were present with the employees on a daily basis and performed the weekly safety inspections of their departments.
Glover stated that he would perform quarterly in-depth documented inspections of the KWPRD premises looking for anything that OSHA “might have issues with.” Glover further stated that he would also make frequent undocumented walk-through inspections of the KWPRD premises. Glover would report his findings from the inspections to KWPRD and would make recommendations to KWPRD based on those findings. Glover testified that KWPRD followed his recommendations and that he “never requested [KWPRD] to do anything that [it] did not do.”
Glover testified that he did not know until after the accident made the basis of this action that the drivers of the Ottawa semi-tractors would use spotters when *1165 backing a tanker-trailer into a loading bay. Glover stated that at the time the accident occurred there were no safety policies or procedures in place at KWPRD relating to backing a tanker-trailer into a loading bay using an Ottawa semi-tractor.
James Thomas was employed by KWPRD as its plant superintendent at the time of the accident. Thomas testified that he occasionally discussed with Glover “some safety things” at the KWPRD plant. Thomas also testified that Glover would periodically conduct safety inspections of the KWPRD plant and would bring to Thomas’s attention any' hazards that he might discover. Thomas stated that he would then inform the supervisors of Glover’s findings at the safety meetings he conducted. J. Scott Saunders, then the general manager at KWPRD, testified that he looked to the EHS department at Sanders Lead for “policies, procedures, materials, and guidance” on safety-related issues.
OSHA conducted an investigation of the accident; both Baggett and Glover participated on behalf of KWPRD. Following the investigation, OSHA made recommendations to KWPRD, including that employees in the shipping department wear high-visibility vests, that back-up alarms be installed on all Ottawa semi-tractors,[5] and that training and testing for employees working in the shipping department be implemented with regard to backing the tanker-trailers with the Ottawa semi-tractors. Glover drafted the specific safety procedures relating to backing a tanker-trailer using an Ottawa semi-tractor at KWPRD. Those procedures, entitled “Ottawa Positioning/Backing Procedures for Bulk Tanker Trailers,” required, among other things, that the drivers of the Ottawa semi-tractor use a spotter each time they backed' a tanker-trailer into the loading bay; that the Ottawa semi-tractor drivers and spotters must be trained in this procedure before they are allowed to drive an Ottawa semi-tractor or to spot for an Ottawa semi-tractor; that the Ottawa semi-tractor drivers make a 360-degree inspection around the truck to ensure no obstructions or hazards are present before beginning the back-up procedure; and that the Ottawa semi-tractor driver should immediately stop the back-up maneuver should he or she lose sight of the spotter. Thomas testified that, following the accident, Glover came to KWPRD and conducted a training session on the proper procedures for backing a tanker-trailer into a loading bay with an Ottawa semi-tractor while using a spotter.
On November 16, 2010, Shamirey Williams and Jacory and Demond Williams, minor dependents of Williams, by and through their mothers and next friends, sued KWPRD and Ousley under § 26-5-11, Ala.Code 1975, and § 6-5-410, Ala.Code 1975, alleging the intentional removal of a safety device, i.e., the back-up-alarm system, and the willful and intentional violation of safety rules. It appears that KWPRD and Ousley were never served.
On September 23, 2011, Elmer, by and through his wife and guardian, Wanda A. Fleming, sued Baggett and Glover, among others who are no longer parties to this action, alleging, among other things, that they willfully and intentionally “altered, removed, bypassed or failed to maintain” the back-up-alarm system on the Ottawa semi-tractor. Baggett and Glover answered the complaint and asserted certain affirmative defenses.
On October 19, 2011, Jamarion, a minor dependent of Williams, by and through his *1166 mother and next friend, sued Baggett and Glover, among others who are no longer parties to this action, under § 26-5-11, Ala.Code 1975,[6] alleging, among other things, that Baggett and Glover willfully and intentionally “altered, removed, bypassed or failed to maintain” the back-up-alarm system of the Ottawa semi-tractor, which proximately resulted in his father’s death. Baggett and Glover answered the complaint and asserted certain affirmative defenses.
. On November 8, 2011, KWPRD, Ousley, Baggett, and Glover moved the trial court to consolidate the three cases, arguing that they arose out of the same set of operative facts and concerned common questions of law and fact.
On December 6, 2011, Fleming amended her complaint to add Sanders Lead as a defendant, among others who are no longer parties to this action, and to further allege that Sanders Lead had failed to properly maintain the Ottawa semi-tractor and its back-up-alarm system, which, she said, proximately resulted in Elmer’s injuries. Sanders Lead and the other named defendants answered Fleming’s amended complaint and asserted certain affirmative defenses.
Thereafter, the action against KWPRD and Ousley commenced by Shamirey, Jaco-ry, and Demond was voluntarily dismissed. On January 10, 2012, the trial court entered an order consolidating Fleming’s case with Jamarion’s case. On March 19, 2012, Jamarion amended his complaint to add Shamirey, Jacory, and Demond as additional plaintiffs and to add Sanders Lead as a defendant, among others who are no longer parties to this action. The Williams plaintiffs further alleged, among other things, that Sanders Lead had failed to properly maintain the Ottawa semi-tractor and its back-up-alarm system, which, they said, proximately resulted in Williams’s death. The defendants answered this amended complaint and asserted certain affirmative defenses.
On October 1, 2014, on the motion of the plaintiffs, the trial court entered an -order dismissing all defendants except Glover, Baggett, and Sanders Lead.
On March 16, 2015, the defendants moved the trial court for a summary judgment as to the claims against them. The plaintiffs’ consolidated complaints asserted two counts against the defendants, both of which were predicated upon the absence of a back-up-alarm system on the Ottawa semi-tractor on the day of the accident. The defendants argued that a. back-up-alarm system was not required on the Ottawa semi-tractor; that the plaintiffs had not alleged that the defendants failed to provide Williams and Elmer with a safe workplace in violation of § 25-l-l(a), Ala. Code 1975; that Glover and Baggett were not co-employees or supervisors of Williams and Elmer or officers of KWPRD; that Sanders Lead was not Williams’s or Elmer’s employer and is' a separate legal entity from KWPRD; that Glover, Baggett, and Sanders Lead, as “outside” parties, could not have assumed or been delegated the duty to provide Williams and Elmer a safe workplace in the context of a claim brought pursuant to § 25-l-l(a), Ala.Code 1975; and that Williams and Elmer had voluntarily assumed the risk and were contributorily negligent, which proximately caused Elmer’s injuries and Williams’s death.
On March 27, 2015, the plaintiffs filed amended complaints, asserting additional claims against the defendants. The plaintiffs alleged that the .defendants affirma *1167 tively undertook a duty to “inspect for, identify, and provide remedies to correct jobsite safety hazards” at KWPRD; that the defendants acted negligently and/or wantonly with respect to the affirmative undertaking to “inspect for, identify, and provide remedies to correct jobsite safety hazards” associated with the “method and manner” of backing the tanker-trailers into the loading bay with the Ottawa semi-tractor; and that Elmer suffered severe injuries and Williams was killed as a proxi-maté result of the'defendants’ negligent and/or wanton inspection of the KWPRD premises.
On April 3, 2015, the defendants moved the trial court to strike the plaintiffs’ amended complaints, arguing that the plaintiffs had failed to seek leave of the trial court to filed the amended complaints pursuant to Rule 15, Ala. R. Civ. P.[7] On April 9, 2015, the trial court entered an order striking the plaintiffs’ amended complaints.
On April 15, 2015, Fleming moved the trial court for leave to amend her complaint and to vacate or set aside its order granting the defendants’ motion to strike her amended complaint. On April 16, 2015, the Williams plaintiffs moved the trial court for leave to amend their complaint. On April 17, 2015, the Williams plaintiffs moved the trial court to vacate or set aside its order granting the defendants’ motion to strike their amended complaint. On April 20, 2015, the trial court ordered that the plaintiffs’ motions to vacate and for leave to amend their complaints would be heard on May 1, 2015, in advance of the hearing on the defendants’ summary-judgment motion.
On April 28, 2015, the plaintiffs filed responses in opposition to the defendants’ summary-judgment motion, arguing, among other things, that-the defendants undertook a duty to inspect for safety hazards on the premises of KWPRD; that the defendants owed a duty to ensure that safety hazards were properly discovered and reported through the frequent inspections of the KWPRD premises; and that there is. substantial evidence that the defendants should have known, through their frequent inspections, that the manner in which the employees of KWPRD were using the Ottawa semi-tractor to back the tanker-trailers into the loading bay posed a hazard and should have been corrected. The plaintiffs also argued that the defendants had failed to meet the “very demanding” burden of establishing that the plaintiffs had assumed the risk or were contributorily negligent in their own injuries or death.
Following a hearing on the parties’ pending motions, the trial court, on June 5, 2015, entered an order (1) granting the plaintiffs’ motions to set aside the trial court’s prior order granting the defendants’ motion to strike their amended complaints, (2) granting the plaintiffs leave to amend their complaints, and (3) granting the defendants’ motion for a summary judgment on the plaintiffs’ claims. With regard to the plaintiffs’ claims alleging negligent or wanton inspection (“the wrongful-inspection claims”), the trial court expressly found: (1) that there was no substantial evidence that the defendants’ alleged “wrongful inspections proximately caused” Williams’s death or Elmer’s injuries and (2) that the evidence is insufficient to establish' that any of the defendants allegedly “wrongfully performed safety inspections at KWPRD ... *1168 resulted in or contributed to” Williams’s death or Elmer’s injuries. The plaintiffs appeal, challenging the summary judgment only as it relates to the wrongful-inspection claims.

Standard of Review

In Pittman v. United Toll Systems, LLC, 882 So.2d 842, 844 (Ala.2003), this Court set forth the standard of review applicable to a summary judgment:
“This Court’s review of a summary judgment is de novo.
“ ‘In reviewing the disposition of a motion for summary judgment, “we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,” Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was “entitled to a judgment as a matter of law.” Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993) [overruled on other grounds, Bruce v. Cole, 854 So.2d 47 (Ala.2003)]; Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).’ ”
Additionally,
“[u]nless a motion for summary judgment challenges the existence of evidence to support an essential element of the nonmoving party’s case, the motion does not shift to the nonmoving party any burden to produce evidence supporting that essential element, and the motion will not support a summary judgment grounded on an absence of supporting evidence or the existence of undisputed countervailing evidence on that essential element. Kennedy v. Western Sizzlin Corp., 857 So.2d 71, 78 (Ala.2003); Tanner v. State Farm Fire & Cas. Co., 874 So.2d 1058, 1068 n. 3 (Ala.2003); Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003); Fountain v. Filson, 336 U.S. 681, 683, 69 S.Ct. 754, 93 L.Ed. 971 (1949).”
Ex parte McCord-Baugh, 894 So.2d 679, 683 (Ala.2004).

Discussion

The plaintiffs first argue that the trial court erred by basing its order entering a summary judgment for the defendants on the plaintiffs’ claims alleging negligent and/or wanton inspection of the KWPRD premises on the lack of substantial evidence establishing the prima facie element of causation. The plaintiffs contend that the defendants failed to challenge in their summary-judgment motion the existence of substantial evidence establishing the prima facie element of causation in the plaintiffs’ wrongful-inspection claims; therefore, they argue, the burden of establishing such evidence did not shift to the plaintiffs. The defendants respond by arguing that they challenged, on sever *1169 al occasions, the existence of evidence establishing causation in this case.
The only claims asserted by the plaintiffs' against the defendants pending when the defendants moved the trial court for a summary judgment were the two counts predicated upon the absence of a back-up-alarm system on the Ottawa semi-tractor at the time of the accident. One count alleged that Glover and Baggett were co-employees and/or supervisors of Williams and Elmer and that they had willfully and intentionally altered, removed, bypassed or failed to maintain or install a safety device, i.e., the back-up-alarm system on the Ottawa semi-tractor. The second count alleged that Sanders Lead was responsible for the inspection, maintenance, and repair of the Ottawa semi-tractor along with its safety devices, including the. back-up-alarm system, and had negligently, wantonly, and/or willfully breached its duty to provide, install, maintain, inspect, and/or repair the back-up-alarm system on the Ottawa semi-tractor. The defendants’ motion for a summary judgment challenged the existence of evidence in support of the plaintiffs’ claims predicated upon the absence of a back-up-alarm system on the Ottawa semi-tractor.
Subsequent to the defendants’ filing their motion for a summary judgment, the plaintiffs amended their complaints to' assert claims of negligent or wanton inspection of the KWPRD premises. Thereafter, the trial court entered a summary judgment in favor of the defendants on the plaintiffs’ wrongful-inspection claims, expressly finding that there was no substantial evidence that the defendants’ alleged “wrongful inspections proximately caused” Williams’s death or Elmer’s injuries and that the evidence was insufficient to establish that any defendant “wrongfully performed safety inspections at KWPRD that resulted in- or contributed to” Williams’s death or Elmer’s injuries. At no time before the trial court entered the summary judgment in favor of the defendants on the plaintiffs’ wrongful-inspection claims did the defendants amend their summary-judgment motion to challenge the existence of evidence establishing the essential element of proximate causation in the plaintiffs’ newly asserted wrongful-inspection claims. Rather, to the extent the defendants challenged the existence of evidence supporting the element of proximate causation in their summary-judgment motion,[8] they did so in the context of the plaintiffs’ claims predicated upon the absence of a back-up-alarm system on the Ottawa semi-tractor and in support of their own affirmative defenses of assumption of the risk and contributory negligence. The defendants never challenged the existence of evidence supporting the element of proximate causation in the context of the plaintiffs’ wrongful-inspection claims,[9] which the plaintiffs had asserted subsequent to the defendants’ filing their motion for a summary judgment. Because the defendants’ summary-judgment motion did not challenge the existence of evidence supporting the element of proximate causation in the plaintiffs’ wrongful-inspection claims, the defendants’ motion did not shift any burden to the plaintiffs to produce evidence supporting that element of their wrongful-inspection claims. We recognize that the trial court granted the plaintiffs’ motion to amend their complaints to add the wrongful-inspection claims on the same day it entered a sum *1170 mary judgment in favor of the defendants. Nevertheless, the defendants’ summary-judgment motion failed to challenge the existence of evidence establishing the element of proximate causation as to the wrongful-inspection claims and, therefore, does not support the summary judgment, which is expressly grounded on the lack of evidence establishing the element of proximate causation as to the plaintiffs’ wrongful-inspection claims. Ex parte McCordBaugh, supra.

Conclusion

■ We reverse the summary judgment in favor of the defendants on the plaintiffs’ wrongful-inspection claims in these consolidated appeals and remand for further proceedings.
1141111—REVERSED AND ’ REMANDED.
1141112—REVERSED AND REMANDED.
STUART, PARKER, MURDOCK, SHAW, MAIN, WISE, and BRYAN, JJ., concur.
MOORE, C.J., concurs in the result.

. Ottawa brand semi-tractors have an automatic transmission, drive similar to a pick-up truck and have a "very low speed application.” The Ottawa brand semi-tractors owned by KWPRD were not equipped with back-up-alarm systems. The operator of an Ottawa brand semi-tractor is not required to possess a commercial drivers license.

. Sanders Lead and KWPRD are affiliated with each other but are separate legal entities.

. Although affiliated with Sanders Lead and KWPRD, KWP is a separate legal entity.

4. The "Safety Office” referenced in the employee handbook refers to the EHS department.

. The back-up-alarm systems were installed on the Ottawa semi-tractors following this recommendation by the Sanders Lead maintenance department.

. See § 6-5-410, Ala.Code 1975, which expressly provides that a wrongful-death action brought under that section be brought by the decedent’s personal representative.

. The trial court had set the defendants’ motion for a summary judgment for a hearing on May 1; 2015. '

. The plaintiffs appear to argue that the defendants failed to address the issue of proximate causation in any respect in their summary-judgment motion.

. It goes without saying that proximate causation is an essential element of any negligence and/or wantonness claim. Lemley v. Wilson, 178 So.3d 834 (Ala.2015).